UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ELYSE DICKERSON, on behalf of herself, and
SUSAN ORR, on behalf of herself and all others
similarly situated,**

**PLAINTIFFS,**

**-- against --**

**NOVARTIS CORPORATION  and
ALCON LABORATORIES, INC,,**

**DEFENDANTS.**

**INDIVIDUAL AND
COLLECTIVE ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

 **No. 15-CV-1980 (GHW)**

Plaintiff Elyse Dickerson, in her individual capacity, and Plaintiff Susan Orr, in her individual capacity and on behalf of a collective of similarly-situated female employees, by and through their attorneys, Sanford Heisler Kimpel, LLP, bring this action to redress gender discrimination in employment perpetrated by Defendants Novartis Corporation and Alcon Laboratories, Inc.  Upon knowledge concerning themselves and their own acts, and upon information and belief as to all other matters, Plaintiffs allege as follows:

I.    <u>OVERVIEW</u>

1.    Defendant Novartis Corporation ("Novartis Corporation" or "Novartis Group") is based in New York, New York and is one of the largest pharmaceutical and healthcare companies in the world.  Defendant Alcon Laboratories, Inc. ("Alcon," "the Alcon division," or "Novartis's Alcon division") is the second largest of Novartis Group's three "powerhouse divisions." According to the latest Novartis Annual report, Novartis Group employs over 133,000 people worldwide, including nearly 24,000 employees globally in its Alcon division, and had net sales of approximately $58 billion in 2014, including net sales of approximately

$10.8 billion in its Alcon division.

2.      Plaintiff Elyse Dickerson ("Plaintiff Dickerson" or "Ms. Dickerson") and Plaintiff Susan Orr ("Plaintiff Orr" or "Dr. Orr") were among the Alcon division's most talented and ambitious professionals.  Ms. Dickerson was Alcon's first female Global Director and managed one of the Alcon division's largest product portfolios, directly overseeing more than 15% of net sales for the entire Alcon division and almost 3% of net sales for all of Novartis Group.  Dr. Orr was the initiator and a primary driver of the acquisition of a potential blockbuster medication, which is projected to become the highest grossing drug ever sold by the Alcon division.

3.      Despite Ms. Dickerson's and Dr. Orr's distinguished performance, Alcon and Novartis Group (collectively, "Novartis" or "the Company") discriminated against them on the basis of their gender.  For years, the Company paid them less than similarly-situated men, discriminated against them in assignments and other career-enhancing opportunities, and denied them promotions in favor of similarly-situated men.

4.      The lack of advancement opportunities left Dr. Orr with little choice but to eventually resign.  Ms. Dickerson tried to fight Novartis's glass ceiling from within and complained about the Company's blatant gender discrimination.  In response, Novartis fiercely retaliated against her: Novartis downgraded her performance ratings without justification, launched an investigation into her past activities to try to contrive a reason to fire her, and ultimately terminated her just over two weeks before a majority of her Novartis stock grants – worth in excess of $750,000 – were scheduled to vest.

5.      Gender discrimination is a common experience for female directors in Novartis's Alcon division.  Novartis has engaged in systemic gender discrimination against its female

directors through centralized decision-making by the predominantly male senior management and through common policies, practices, and procedures.

6.      Following a jury award of over $250 million in a gender discrimination class action against Novartis Group's largest division, the most recent Novartis Annual Report claims that "Novartis [has] continued to focus on the promotion of women" and that "Novartis divisions operate initiatives to support women in their move into management roles."  Despite these representations, there is no indication that any effective female management initiatives have been rolled out in Novartis's Alcon division.  In fact, Alcon's website devotes less than 100 words to the subjects of "diversity and inclusion" and does not reference any initiatives to promote or support female advancement.

7.      While the most recent Novartis Annual Report claims that women make up 40% of Novartis Group's management, that figure is a product of creative accounting.  The reality is that women are conspicuously absent from the Company's executive leadership ranks.  In fact, when Plaintiff Elyse Dickerson publicly questioned a Novartis Executive Committee member – the Alcon Division Head – at a global webcast about what the Company was doing to close the gender gap in the leadership of the Alcon division, the Alcon Division Head deflected the question.  The other executives participating in the global webcast admitted there was a gender problem but could not provide details about how Novartis planned to remedy the problem.

8.      By bringing this case, Plaintiffs hope to finally spur the Company to action.

9.      Ms. Dickerson, acting in her individual capacity, seeks redress under Title VII of the Civil Rights Act of 1964, as amended.  Ms. Dickerson sues to be reinstated to the job that she would now be occupying but for Novartis's gender discrimination and retaliation; to enjoin Novartis's discriminatory policies, practices, and procedures; and to recover damages in excess

3

of $10 million, including, but not limited to, back pay, compensatory damages, punitive damages, and reasonable attorneys' fees and litigation costs.

10.     Dr. Orr seeks redress, on behalf of herself and a collective action class of similarly-situated female employees, for violations of the Equal Pay Act of 1963 ("Equal Pay Act" or "EPA").  Dr. Orr sues to recover damages for the collective action class and herself in excess of $100 million, including, but not limited to, back pay, liquidated damages, and reasonable attorneys' fees and litigation costs.  Additionally, Dr. Orr, acting in her individual capacity, seeks redress under Title VII of the Civil Rights Act of 1964, as amended.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended; the Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq.*; and 28 U.S.C. § 1331.

12.     Venue is proper in this District under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b).  Defendant Novartis Corporation is headquartered in this District, and Defendants Novartis Corporation and Alcon transact substantial business in this District on an ongoing basis. Unlawful employment practices were committed in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including Novartis Group's setting of employment policies, practices, and procedures for its Alcon division and Novartis's sham investigation of Ms. Dickerson.

13.     Plaintiff Dickerson has standing to bring this suit pursuant to Title VII.  On August 12, 2014, Ms. Dickerson timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which contained both individual and class charges.  On January 28, 2015, the EEOC issued a right to sue letter to Ms. Dickerson.

Plaintiff Orr has standing to bring Title VII claims as part of this suit pursuant to Ms. Dickerson's charge of discrimination.

### III.     THE PARTIES

14.     From March 2002 until her discriminatory and retaliatory termination on January 2, 2015, **PLAINTIFF ELYSE DICKERSON** was a female "employee" at the Company, as defined by Title VII and the EPA.  She currently resides in Fort Worth, Texas.

15.     From October 1997 until she resigned from the Company on April 2, 2014, **PLAINTIFF SUSAN ORR** was a female "employee" at the Company, as defined by Title VII and the EPA.  She currently resides in Ambler, Pennsylvania.

16.     **DEFENDANT NOVARTIS CORPORATION** is a multinational corporation engaged in the business of developing, manufacturing, marketing, and sale of pharmaceutical and healthcare products.  Defendant Novartis Corporation is incorporated in New York and headquartered in New York, New York.  It regularly transacts business in this District.

17.     At all times since the completion of a merger on or about April 8, 2011, **DEFENDANT ALCON LABORATORIES, INC.** is and has been a division and wholly-owned subsidiary of Defendant Novartis Corporation.  Prior to that time, from on or about August 26, 2010, to on or about April 8, 2011, Alcon Laboratories, Inc. was controlled by Novartis Corporation, which had a 77% ownership interest in Alcon. Defendant Alcon Laboratories, Inc. is incorporated in Delaware, has offices in six states in the United States, and has a sales force that operates across the United States.  It regularly transacts business in this District.

18.     At all times relevant to this action, Defendants Novartis Corporation and Alcon were and are "employers" covered by Title VII and the EPA.  At all times since they completed

their merger on or about April 8, 2011, Defendants Novartis Corporation and Alcon have operated as Plaintiffs' single employer or, alternatively, as Plaintiffs' joint employers.

19.     Novartis Corporation and Alcon operate as a single, integrated enterprise with respect to their employment policies, practices, and procedures, characterized by an interrelation of operations, centralized control of labor relations, common management, and common ownership and financial control.  There is considerable mobility among the divisions of Novartis Group, as Alcon's recruitment materials emphasize.  In fact, seven of the fifteen members of Alcon's Executive Leadership Team previously worked in other Novartis Group divisions, and the Global Head of Alcon, Jeff George, is a member of the Novartis Executive Committee.

### IV.     FACTUAL ALLEGATIONS

### A.     THE COMPANY'S BOYS' CLUB ATMOSPHERE

20.     The executive leadership of Novartis Group and its Alcon division is almost exclusively male.  All nine members of the Novartis Executive Committee are male, as are all five of the other members of Novartis Group's senior management. Within Novartis's Alcon division, twelve out of the fifteen members of the Executive Leadership Team – including the Global Head of Alcon, the Chief Financial Officer, all five Region Presidents, and the Senior Vice President for Human Resources – are male.  Upon information and belief, women make up fewer than 15% of Vice Presidents and Senior Directors in Novartis's Alcon division.

21.     In Novartis's Alcon division, male senior leaders foster a "boys' club" atmosphere and mentality that is hostile to women and their advancement.

22.     For example, then-Vice President Jim Murphy told a female Director that she was not "committed" to her job because she requested some flexibility to deal with childcare issues,

causing her to leave the Company; rather than being disciplined, Mr. Murphy was subsequently promoted to Alcon's Executive Leadership Team, where he still sits today.

23.     Additionally, a current Executive Leadership Team member arranged on multiple occasions for prostitutes to meet with doctors whom the Company viewed as "key opinion leaders," but was never demoted or disciplined for this inappropriate activity.

24.     Another Executive Leadership Team member vetoed the hiring of a highly-qualified candidate for a Director-level position because the candidate was openly gay, saying that the Company was "not ready for that."

25.     One of the Alcon division's current Vice Presidents told one of his female subordinates that her work was "so good it gave [him] a woody."  Upon information and belief, the Novartis Business Practices Office investigated this incident, but Novartis never disciplined the Vice President for his harassing behavior.  To the contrary, the Vice President was selected to be a member of the governance committee for a diversity initiative in the Alcon division, the Women Innovating Now program.

26.     Additionally, the Company refused to immediately terminate a male Senior Marketing Manager following a meeting where that Manager undid his belt buckle and suggestively remarked, "Let me introduce you to the newest member of the team."

27.     The "boys' club" atmosphere and mentality in Novartis' Alcon division results in diminished compensation and promotional and career-enhancing opportunities for women.

28.     In Novartis's Alcon division, male senior leaders take male employees under their wing, provide them with informal networking and mentorship opportunities, and groom them for senior leadership positions.  For instance, male senior leaders have invited male employees to play golf, drink at bars, participate in "breakfast clubs," and visit strip clubs together, but female

7

employees rarely have been included in such events.  Meanwhile, male senior leaders often bully or belittle female employees and often cut women off or speak over them at meetings.

29.     Novartis gives raises and promotions to talented men in their Alcon division but routinely denies comparable compensation and promotional opportunities to talented women.

30.     At an executive roundtable held on October 24, 2011, entitled "Exploring Leadership Dynamics – What Men Say About Women Leaders," Executive Leadership Team member Stuart Raetzman openly admitted that male leaders at the Company preferentially selected their male colleagues for promotions even if female candidates were more qualified.

31.     Alcon's former Director for Human Resources for Global Commercial Strategy, Anithea Smith-Dorch, remarked to Plaintiff Dickerson that she was surprised the Company had not been sued for gender discrimination based on the lack of women in the ranks of senior management in the Alcon division.

## B.     NOVARTIS GROUP AND THE ALCON DIVISION'S COMMON EMPLOYMENT POLICIES AND CENTRALIZED DECISION-MAKING

32.     Novartis Group establishes common employment policies, practices, and procedures for its Alcon division.  Alcon's recruitment materials stress Alcon's role "as part of the Novartis Group of Companies" and refer collectively to "our policies" in recruitment, hiring, training, promotion, and other employment practices.

33.     Novartis Group sets the compensation and benefits policies for its Alcon division. Novartis Group sets base salary targets and establishes the policies that are used to grant salary increases for employees in its Alcon division.  Novartis Group also establishes the bonus policy for its Alcon division, directing that a mathematical formula developed by Novartis Group be used to compute the "annual incentives" that are paid to employees in its Alcon division.

Novartis Group also establishes the targets that are used to award equity, such as restricted stock units or tradable options, to employees in its Alcon division.

34.     Novartis Business Services, a shared-service organization for divisions of Novartis Group, operates the Alcon division's payroll and personnel administration services. Novartis Group also controls and administers benefits programs for Novartis's Alcon division employees, including the Novartis health insurance plan, the Novartis Investment Savings Plan, Novartis's stock incentive plan, and an executive retirement plan called the Novartis Restoration Plan.

35.     Novartis Group establishes a formal performance management process for its Alcon division.  Novartis Group requires that these employees be rated based on two metrics: their achievement of "Objectives" and their compliance with "Novartis Values and Behaviors." The metric of "Novartis Values and Behaviors" is subjective and is used to downgrade the performance ratings of female employees.  This causes and/or contributes to pay discrimination against female employees, because Novartis Group requires that these subjective performance metrics be factored into decisions regarding salary increases, bonuses, and equity grants.

36.     Novartis Group vests final decision-making authority over the compensation paid to its Alcon employees with the predominantly male senior management.  The predominantly male senior managers participate in "calibration meetings" where they may and do alter performance ratings to the disadvantage of female employees.

37.     Novartis Group establishes and enforces a policy of secrecy regarding compensation that perpetuates pay discrimination.  Novartis Group directs senior managers to tell employees not to discuss compensation programs, mechanics, targets, or their own compensation with others.

38.     Novartis Group controls and operates the employee complaint process used in all of its divisions, through an operation called the Novartis Business Practices Office.   While originally created in response to a gender discrimination class action and intended to investigate claims of discrimination and harassment, the Company has exploited the Novartis Business Practices Office and its investigatory resources to retaliate against employees.

**C.     PLAINTIFF ELYSE DICKERSON**

*1.     Ms. Dickerson's Distinguished Performance*

39.     Ms. Dickerson received her Bachelor of Arts degree from the University of Notre Dame in 1996 and earned a Master's in Business Administration from Southern Methodist University in 2000.   She completed continuing education programs at the Kellogg School of Management at Northwestern University in 2005 and at the Stagen Integral Leadership Program in 2013.

40.     At the Company, Ms. Dickerson worked as an Associate Product Manager from March 2002 to January 2003, Product Manager from January 2003 to January 2005, and as a Senior Product Manager from January 2005 to January 2010.   She worked as a Global Director for Pharmaceuticals from January 2010 until her discriminatory and retaliatory termination on January 2, 2015.

41.     Ms. Dickerson was a strong performer.   In her annual performance reviews, she typically garnered high ratings.   As a result of her strong performance, she twice earned spots in Novartis's "Role of the Leader" program, a leadership training event reserved for Novartis's top performers.

42.     At the time Novartis terminated her, Ms. Dickerson was a Global Director managing one of the largest product portfolios in the entire Alcon division.   Ms. Dickerson

directly oversaw over ten major brands with net sales that totaled approximately $1.7 billion in 2014 – representing more than 15% of Alcon's net sales and almost 3% of net sales for all of Novartis Group for that year.  In 2014, she achieved such strong results for one of her products that its "double-digit growth" was highlighted in the Novartis Annual Report.

43.     Ms. Dickerson's performance also earned recognition outside of Novartis.  In 2012, an independent, New York-based pharmaceutical marketing magazine awarded her its Trail Blazer Brand Champion Award, an award given to "exceptional contributors" with "outstanding leadership, innovation, creativity and a dedication to improving patients' lives" who have "initiated groundbreaking marketing strategies and tactics."  In 2013, she was awarded the Stagen Integral Leadership Program's Black Belt Award for outstanding leadership.

### 2.     The Company Discriminated Against Ms. Dickerson

44.     Despite her distinguished performance, the Company's senior management marginalized and discriminated against Ms. Dickerson based on her gender.

45.     In 2008, Alcon's then-CEO Cary Rayment told her that her career options with the company were "limited" because she "had a husband with a career."

46.     In 2009, even though Ms. Dickerson's performance merited the highest rating possible, then-Vice President Jim Murphy, who currently sits on the Alcon division's Executive Leadership Team, told Ms. Dickerson that there had been a "long debate" among Alcon's Vice Presidents, all of whom were male, about whether to reduce her rating because she had been on maternity leave for part of the review period.

47.     Ms. Dickerson repeatedly requested cross-divisional or cross-brand experiences, but the Company did not provide her with these career-enhancing opportunities.  Nor did the Company grant her repeated requests – over the span of ten years – for overseas assignments that

would help advance her career.   By contrast, the Company moved Ms. Dickerson's male colleagues between divisions, brands, and countries, thereby grooming them for leadership positions.

48.     In 2009, Ms. Dickerson, who at the time was a Grade 25 employee, took over the job responsibilities of a departing Grade 27 employee, in addition to Ms. Dickerson's preexisting duties.   Ms. Dickerson requested a pay increase commensurate with her expanded job responsibilities, but the Company refused to promote her to the Grade 27 level and instead maintained her at the Grade 25 level.   In so doing, the Company denied Ms. Dickerson not only a higher Grade 27 salary, but also all the benefits that came with a Grade 27 position, including increased bonuses, increased stock grants and/or stock options, a car allowance, and an annual executive physical.

49.     In January 2010, Ms. Dickerson became a Global Director of Pharmaceuticals; she was the first and, at the time, the only female Global Director at Alcon.   Even though Global Directors are typically Grade 30 positions, the Company put Ms. Dickerson at the Grade 29 level – depriving her of the benefits available only to employees at or above Grade 30, including enrollment into the pension plan, enrollment in a company-sponsored variable annuity, and significantly increased bonuses and stock grants and/or stock options. Furthermore, the Company paid Ms. Dickerson the lowest possible salary authorized for a Grade 29 position.   Vice President Alex Long ("VP Long") told her that she would remain at a Grade 29 salary until she had "proven herself."   When Ms. Dickerson asked VP Long whether the other Global Directors (all of whom were male) were subject to the same probationary treatment, he admitted that they were not.

50.     In March 2011, after Ms. Dickerson had performed Global Director duties for over a year without commensurate compensation and benefits, the Company finally adjusted her position to the Grade 30 level, but the Company set her salary in the bottom quartile for that grade.  Upon information and belief, the Company set her salary at an amount that was lower than any of the males holding the same grade or title.

51.     Both prior to and throughout her time as a Global Director, Ms. Dickerson was paid less than similarly-situated male employees.  Upon information and belief, Rafael Chan, Jim Sluck, and Seph Jenson – male Directors whose experience, qualifications, and career trajectories were nearly identical to Ms. Dickerson's – all received higher salary, larger bonuses, and more stock grants and/or stock options than did Ms. Dickerson.

52.     In or about December 2012, Novartis deprived Ms. Dickerson of the high performance rating that she deserved.  Ms. Dickerson's supervisor at the time, Judy Robertson, fought for Ms. Dickerson to receive the highest rating – a "3.3" – based on Ms. Dickerson's exceptional performance in 2012, but senior management refused.  At the calibration meeting where Ms. Dickerson's performance rating was being discussed, Executive Leadership Team member Stuart Raetzman shook his head "no," claimed that he did not "see the leader" in Ms. Dickerson, and reduced Ms. Dickerson's "Novartis Values and Behaviors" rating while approving higher ratings for male employees.  Novartis's downgrading of Ms. Dickerson's performance rating caused her financial losses because bonuses, stock grants and/or stock options, and other forms of compensation are directly tied to performance ratings.  In her final performance evaluation of Ms. Dickerson, Ms. Robertson remarked that the Executive Leadership Team was overlooking Ms. Dickerson's significant accomplishments.

53.     In December 2012, Ms. Dickerson's job responsibilities increased further after another Global Director, Bob DeBartolo, left Novartis and the Company reassigned his responsibilities to Ms. Dickerson.   In March 2013, Ms. Dickerson requested a pay increase and/or a promotion to reflect her expanded responsibilities, but once again the Company rejected her request.   By contrast, the Company increased the grade level and compensation of Joe Griffin, a male employee reporting to Ms. Dickerson who had also assumed increased responsibilities as a result of Mr. DeBartolo's departure.

### 3.  *Novartis Retaliated Against Ms. Dickerson After She Complained About Gender Discrimination and Engaged in Protected Activities*

54.     Ms. Dickerson was a vocal opponent of the Company's discriminatory policies, practices, decisions, and corporate culture.   She complained on several occasions about the gender discrimination she was experiencing, as well as the Company's disparate treatment of women more generally.   Rather than take action to remedy its wrongdoing, Novartis retaliated against and ultimately wrongfully terminated Ms. Dickerson.

55.     For example, in January 2013, after Novartis deprived Ms. Dickerson of the high performance rating that she deserved, Ms. Dickerson complained to her supervisor, Ms. Robertson, about the Company's discriminatory treatment.

56.     In May 2013, Ms. Dickerson's new supervisor, Jeff Evanson, told her that he was recommending her for a role as Global Director of Retina, a high profile position.   However, Mr. Evanson's recommendation was overridden by male members of the Executive Leadership Team, who claimed that Ms. Dickerson's "leadership style" was not right for the role.   After the Company denied her the Global Director of Retina role, Ms. Dickerson complained to Mr. Evanson about unequal pay, the lack of a clear career development plan, and general lack of support from the male leadership.

57.     Additionally, on August 29, 2013, during a global webcast hosted by Novartis Executive Committee member and Alcon Division Head Kevin Buehler ("Division Head Bueler") and watched by Company employees around the world, Ms. Dickerson asked what Division Head Buehler and other members of senior management were doing to change the gender gap in the leadership of the Alcon division.  Division Head Buehler deflected the question, while Executive Leadership Team member Stuart Raetzman conceded that female representation at the highest level was "below where we need to be."  None of the executives on the global webcast provided details regarding how the Company planned to remedy the situation. Later that same day, Ms. Dickerson followed up with an email on the subject to Executive Leadership Team members Stuart Raetzman and Robert Warner.  Ms. Dickerson did not receive a substantive response to her inquiry about increasing women's representation among leaders of the Alcon division.  Upon information and belief, the email was forwarded to Novartis Executive Committee member and Alcon Division Head Buehler, but he also took no action.

58.     In or about September 2013, shortly after the global webcast, Division Head Buehler excluded Ms. Dickerson from a project that should have fallen under her purview as the Global Director in charge of the Alcon division's dry eye products franchise.  Instead, Division Head Buehler surreptitiously assigned then-Vice President Jim Murphy to lead the project, who told Ms. Dickerson that he did not want her to be involved.  Ms. Dickerson's direct supervisor, Mr. Evanson, looped Ms. Dickerson back in on the project a mere week before a final recommendation on the project was due.

59.     In or about December 2013, at Ms. Dickerson's annual performance review for 2013, the Company assigned Ms. Dickerson the lowest possible rating – a "1" – on the metric of her adherence to "Novartis Values and Behaviors."  The Company justified the low rating with

vague claims about Ms. Dickerson's "leadership behaviors" and "listening skills."  This criticism was inconsistent with Ms. Dickerson's performance during her prior decade at the Company. The rating was also at odds with the substantive feedback provided in the prior year's evaluation, which had listed the majority of Ms. Dickerson's leadership attributes as strengths, not areas under development.  Ms. Dickerson's supervisor, Mr. Evanson, informed Ms. Dickerson that he had recommended that she receive a higher rating, but the male-dominated Executive Leadership Team had "mandated" that she receive the "1" rating for her "Novartis Values and Behaviors." In conjunction with the low rating, the Company did not give Ms. Dickerson a merit increase to her salary, awarded her a smaller bonus than she had received in years past, and did not give her any stock grants and/or stock options (typically worth hundreds of thousands of dollars).  The Company also took Ms. Dickerson out of the running for new job assignments, including international assignments, cross-divisional opportunities, and other career-enhancing opportunities.

60.     On August 12, 2014, Ms. Dickerson filed her charge of discrimination, alleging both individual and class-wide discrimination, with the EEOC.  The Company was informed of the filing and was warned against retaliating against Ms. Dickerson on account of her protected activities.  Yet rather than comply with its obligation not to retaliate, the Company, through the Novartis Business Practices Office, launched an investigation to try to smear Ms. Dickerson and contrive a reason to terminate her.

61.     On December 13, 2014, Ms. Dickerson went on federally-protected medical leave.  A Company physician had recommended that Ms. Dickerson go on medical leave as a result of the extreme stress and anxiety caused by the Company's continued mistreatment.  Ms. Dickerson's medical leave was scheduled to last until on or about February 1, 2015.

62.     After the Novartis Business Practices Office's sham investigation and during Ms. Dickerson's federally-protected medical leave, Novartis terminated Ms. Dickerson on January 2, 2015.  This was less than five months after she had lodged formal charges of discrimination with the EEOC and just over two weeks before a majority of her Novartis stock grants, which were worth in excess of $750,000, were scheduled to vest.  The Company's explanation of the reasons for Ms. Dickerson's termination was pretextual.

**D.     PLAINTIFF SUSAN ORR**

***1.     Dr. Orr's Distinguished Performance***

63.     Dr. Orr received her Bachelor of Science degree and her Doctor of Optometry degree from the University of Waterloo in Ontario, Canada.  Since Fall 2013, she has also been pursuing a Master's in Business Administration from the University of North Texas.

64.     At the Company, Dr. Orr worked as a Senior Clinical Research Associate from October 1997 until January 1999; Senior Clinical Research Scientist from January 1999 until March 2000; Principal Clinical Research Scientist from March 2000 until July 2002; and Manager from July 2002 until July 2005; Assistant Director from July 2005 until February 2007; Associate Director from February 2007 until approximately mid-2008; and Director from approximately mid-2008 until November 2009.  Dr. Orr worked as a Senior Director from November 2009 until November 2013, with the title of Head of Pharmaceutical Alliances.  From August 2010 until November 2013, Dr. Orr simultaneously served as Head of Academic Collaborations, reporting directly to Executive Leadership Team member Dr. Sabri Markabi.  Dr. Orr subsequently moved from the Company's Research and Development ("R&D") division into its Commercial division, where she was Global Director for New Product and Product Strategy from on or about November 2013 until she resigned from the Company on April 2, 2014.

65.     Dr. Orr was a strong performer.  In her annual performance reviews, Dr. Orr typically garnered high ratings.  As a result of her strong performance, the Company selected Dr. Orr to participate in its Global Leadership Development program, a prestigious summit with only approximately thirty participants world-wide, and her leadership during the program was so exemplary that she was selected to be a coach for the following year's participants.

66.     Among her accomplishments at the Company, Dr. Orr identified and/or led the technical evaluation of multiple medications and devices that the Company added to its product pipeline.  Among those, Dr. Orr was the initiator and a primary driver of a potential blockbuster drug for Novartis.  The drug is projected to eventually become the highest grossing medication that Alcon has ever sold.  Dr. Orr identified the product when it was being developed by another company, championed the opportunity among Alcon's senior management, led Alcon's technical evaluation of and scientific due diligence on the drug, and drove the product through Alcon's internal governance process, leading to Alcon's acquisition of all rights to the break-through product and its product platform.

67.     Among her other accomplishments at the Company, Dr. Orr successfully overhauled the Alcon Research Institute, a renowned organization that funds ophthalmological research by the world's most accomplished vision researchers and clinicians; created the Alcon Research Counsel, a panel of prominent ophthalmic leaders who review and validate the Alcon division's R&D pipeline strategy; and designed the Alcon R&D Internship Program, which enables the Company to draw on young talent from the nation's top universities.

### 2.      *The Company Discriminated Against Dr. Orr*

68.     Despite her distinguished performance, the Company's senior management marginalized and discriminated against Dr. Orr based on her gender.

69.     The Company repeatedly denied Dr. Orr opportunities for advancement within the Alcon division, excluding her from consideration for numerous promotions and systematically promoting male employees who were no more, and often less, qualified than Dr. Orr.

70.     From 2009 through 2011, when Dr. Orr was a Senior Director in the R&D Alliances department, Dr. Orr repeatedly expressed interest in eventually being promoted to the position of Vice President, Head of R&D Alliances. Yet when Dr. Orr's supervisor left that position in or about December 2011, the Company did not post the position or otherwise give Dr. Orr the opportunity to apply, interview, or otherwise submit her candidacy for that role.  Instead, the Company promoted a male with significantly less relevant experience than Dr. Orr to fill the position, Paul Hallen.  When Dr. Orr subsequently questioned a member of the Executive Leadership Team, Dr. Sabri Makabri, about why she was not considered for the promotion, Dr. Makabri was evasive and offered a vague excuse about her not being the "right fit" for the job.

71.     In or about late 2011, the Company created a new position, titled the Head of R&D Strategy and Operations.  The Company did not post the position or otherwise give Dr. Orr the opportunity to apply, interview, or otherwise submit her candidacy for that role, and instead gave the position to a male with significantly less relevant experience than Dr. Orr, namely Weiyi Yang.  The position became open again in 2012 and again in 2013, and Dr. Orr was very interested in the position, which came with a seat on the R&D leadership team.  Both times, however, the Company did post the position or otherwise give Dr. Orr the opportunity to apply, interview, or otherwise submit her candidacy for the role and instead again gave the position to males who had less relevant experience than Dr. Orr, first Michael Parrish and then Eric Carlson.

72.     From in or about August 2010 until mid-2012, Dr. Orr worked on a small team, known internally as "R&D Office," which reported directly to Executive Leadership Team

member Dr. Markabi and whose success in executing important and high-priority R&D initiatives was lauded by Alcon leaders.  After the team disbanded, the Company gave the three male members of the team – Michael Parrish, Andrew Menke, and David Jackson – positions of increased responsibility, but the Company did not promote Dr. Orr.

73.     In 2013, Dr. Orr repeatedly expressed interest in being promoted to the position of Therapeutic Unit Head for Retina, a Vice President-level position.  Dr. Robert Kim, Head of the Pharmaceutical Franchise, endorsed Dr. Orr's candidacy and contacted Executive Leadership Team member Dr. Markabi to request that the Company promote Dr. Orr to this position.  Dr. Markabi, however, blocked the promotion, claiming that Dr. Orr was "underqualified" to serve as a Therapeutic Unit Head.  This explanation of the reason for not promoting Dr. Orr was pretextual.

74.     In 2013, Peter Richardson, who is currently the Alcon division's Chief Medical Officer, told Dr. Orr that, in his opinion, she was the most undervalued individual in Alcon's R&D division.

75.     During her tenure at the Company, Dr. Orr was paid less than similarly-situated male employees.  Male employees received higher base salaries, higher bonuses, and more stock grants and/or stock options than Dr. Orr did for performing similar work.  For example, upon information and belief, when Dr. Orr worked as a Senior Director in Alcon's R&D division, the Company paid her less than male Senior Directors Lynn Winterton and Tariq Aziz, even though they performed the same job duties.  Upon information and belief, when Dr. Orr subsequently became a Global Director in Alcon's commercial division, the Company assigned her a lower salary and a lower bonus than similarly-situated male Directors.

76.     In or about December 2012, as part of her annual performance review for 2012, the Company assigned Dr. Orr the lowest possible rating – a "1" – for her adherence to "Novartis Values and Behaviors."  The Company justified the low rating with vague claims about Dr. Orr's "alignment with Sr. Management" and "listening" skills.  The rating, however, was inconsistent with the feedback that Dr. Orr had received about her performance throughout the course of the year; her direct supervisor, Mr. Hallen, had provided her with no negative feedback prior to the written performance evaluation, and other colleagues, including Executive Leadership Team member Dr. Markabi to whom Dr. Orr also directly reported, had provided only positive feedback to her.  The rating was likewise at odds with Dr. Orr's decade-and-a-half track record at Alcon.  In conjunction with the low rating, the Company did not give Dr. Orr a merit increase to her salary, awarded her a smaller bonus than she had received in years past, and did not give her any stock grants and/or stock options (typically worth hundreds of thousands of dollars).  After she sent a letter objecting to the performance evaluation, Executive Leadership Team member Dr. Markabi admitted that the performance review was "not indicative of your potential."

77.     Following that evaluation and the Company's refusal to promote her to the Therapeutic Unit Head position, Dr. Orr transferred from the R&D division into the Commercial division, where she became a Global Director in or about November 2013.

78.     When in the Commercial division, it became clear that the Company was not going to promote Dr. Orr.  As a result of the lack of advancement opportunities and the unequal pay that Novartis provided due to her sex, Dr. Orr had little choice but to look for jobs elsewhere.  Dr. Orr eventually obtained a position at another pharmaceutical company and resigned from Novartis effective April 2, 2014.  In order to begin her new position, Dr. Orr and her family had to relocate across the country and her spouse had to quit his job.

V.        **COLLECTIVE ACTION ALLEGATIONS (EQUAL PAY ACT)**

79.      The Company has engaged in systemic gender discrimination against its female employees.   The Company has caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices, and procedures, including but not limited to common compensation and performance management policies, and centralized decision-making, including but not limited to calibration meetings held by senior leaders.

80.      Plaintiff Orr re-alleges and incorporates by reference each and every allegation in the previous paragraphs alleging common policies, practices, and procedures resulting in unequal pay earned by female employees in Novartis's Alcon division.

81.      Plaintiff Orr (or "EPA Collective Action Plaintiff") brings collective claims alleging violations of the Equal Pay Act of 1963 ("Equal Pay Act" or "EPA"), as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of all members of the EPA Collective Action Class.  The EPA Collective Action Class consists of all female employees who are, have been, or will be employed by Defendants in Director-level positions, including, but not limited to, Assistant Director, Associate Director, Director, Senior Director, and/or Global Director in Novartis's Alcon division at any time during the applicable liability period ("Female Directors").

82.      The EPA Collective Action Plaintiff seeks to represent all Female Directors described above who were paid less than male employees for doing similar work.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

83.      Questions of law and fact common to the EPA Collective Action Plaintiff and the EPA Collective Action Class as a whole include but are not limited to the following:

         (a)      Whether Defendants unlawfully failed and continue to fail to compensate Female Directors at a level commensurate with similarly-situated male employees;

(b)     Whether Defendants' policy, practice, or procedure of failing to compensate Female Directors a level commensurate with comparable male employees violates applicable provisions of the EPA; and

(c)     Whether Defendants' failure to compensate Female Directors at a level commensurate with comparable male employees was willful within the meaning of the EPA.

84.     Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiff, because her claims are similar to the claims of the EPA Collective Action Class.

85.     The EPA Collective Action Plaintiff and the EPA Collective Action Class (a) are similarly situated; and (b) are subject to Defendants' common compensation policies, practices, and procedures and centralized decision-making resulting in unequal pay based on sex by failing to compensate Female Directors at a level commensurate with male employees who perform substantially equal work and/or hold equivalent levels, job titles, and positions.

**VI.     COUNTS**

**COUNT I**
**(INDIVIDUAL AND COLLECTIVE ACTION CLAIM)**

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963 ("EQUAL PAY ACT"),**
**29 U.S.C. § 206, *ET SEQ.***
**DENIAL OF EQUAL PAY FOR EQUAL WORK**
**(Plaintiff Orr and the Collective Against Defendants)**

86.     Plaintiff Orr re-alleges and incorporates by reference each and every allegation in the previous paragraphs as though fully set forth herein.

87.     This Count is brought on behalf of Plaintiff Orr and all members of the EPA Collective Action Class.

88.     Defendants are employers of Plaintiff Orr and the EPA Collective Action Class

within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq*., as amended by the Equal Pay Act of 1963 ("EPA" or "Equal Pay Act").

89.     Defendants have discriminated against EPA Collective Action Plaintiff and the EPA Collective Action Class by paying them less than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

90.     Defendants so discriminated against EPA Collective Action Plaintiff and the EPA Collective Action Class by subjecting them to common discriminatory pay and performance management policies, including discriminatory salaries, bonuses, stock grants and/or stock options, and other compensation incentives, discriminatory assignments and other opportunities that would result in unequal compensation, and other forms of discrimination in violation of the Equal Pay Act.

91.     The differential in pay between the EPA Collective Action Plaintiff and the EPA Collective Action Class and similarly-situated male employees was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to sex.

92.     Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on sex in violation of the Equal Pay Act.

93.     Defendants intentionally paid the EPA Collective Action Plaintiff and the EPA Collective Action Class less than similarly-situated male employees.  The foregoing conduct constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a). Because Defendants have willfully violated the Equal Pay Act, a three-year statute of limitations applies to such violations pursuant to 29 U.S.C. § 255(a).

94.     As a result of Defendants' unlawful conduct, the EPA Collective Action Plaintiff

and EPA Collective Action Class have suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as non-economic damages.

95.     Plaintiff Orr and the EPA Collective Action Class are entitled to all legal and equitable remedies available for violations of the Equal Pay Act, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to 29 U.S.C. § 216(b).

**COUNT II**
**(INDIVIDUAL CLAIM)**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),**
**42 U.S.C. § 2000e, *ET SEQ.***
**PAY DISCRIMINATION**
**(Plaintiff Dickerson Against Defendants)**

96.     Plaintiff Dickerson re-alleges and incorporates by reference each and every allegation in the previous paragraphs as though fully set forth herein.

97.     Defendants have discriminated against Plaintiff Dickerson by paying her less than similarly-situated male employees on the basis of her gender, including discrimination in setting her base salary, bonuses, stock grants and/or stock options, and other forms of compensation and benefits.

98.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Dickerson, entitling her to punitive damages.

99.     By reason of the continuous nature of Defendants' discriminatory conduct, which persisted throughout Plaintiff Dickerson's employment, Plaintiff Dickerson is entitled to the application of the continuing violation doctrine to all violations alleged herein.

100.     As a result of Defendants' discrimination, Plaintiff Dickerson has suffered and continues to suffer harm, including, but not limited to, lost wages, lost bonuses, lost stock grants and/or stock options and other forms of compensation, lost benefits, and attorneys' fees and costs.

101.     As a further result of Defendants' unlawful conduct, Plaintiff Dickerson has suffered and continues to suffer harm, including, but not limited to, impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.

102.     Plaintiff Dickerson is entitled to all legal and equitable remedies available for violations of Title VII, including, but not limited to, back pay, reinstatement and/or front pay, nominal damages, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and litigation costs.

### COUNT III
### (INDIVIDUAL CLAIM)

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"), 42 U.S.C. § 2000e, *ET SEQ.*
### UNLAWFUL DISCHARGE
### (Plaintiff Dickerson Against Defendants)

103.     Plaintiff Dickerson re-alleges and incorporates by reference each and every allegation in the previous paragraphs as though fully set forth herein.

104.     Defendants have discriminated against Plaintiff Dickerson by discharging her on the basis of her gender.

105.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Dickerson, entitling her to punitive damages.

106.     As a result of Defendants' discrimination, Plaintiff Dickerson has suffered and continues to suffer harm, including, but not limited to, lost wages, lost bonuses, lost stock grants and/or stock options and other forms of compensation, lost benefits, and attorneys' fees and costs.

107.     As a further result of Defendants' unlawful conduct, Plaintiff Dickerson has suffered and continues to suffer harm, including, but not limited to, impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.

108.     Plaintiff Dickerson is entitled to all legal and equitable remedies available for violations of Title VII, including, but not limited to, back pay, reinstatement and/or front pay, nominal damages, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and litigation costs.

**COUNT IV**
**(INDIVIDUAL CLAIM)**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),**
**42 U.S.C. § 2000e-5(f), *ET SEQ*.**
**RETALIATION**
**(Plaintiff Dickerson Against Defendants)**

109.     Plaintiff Dickerson re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

110.     Plaintiff Dickerson engaged in protected activity by filing her charge of discrimination with the EEOC and by otherwise complaining to people in management positions about gender discrimination at the Company.

111.     Defendants engaged in adverse employment actions against Plaintiff Dickerson for engaging in protected activity by downgrading her performance ratings, excluding her from assignments, and ultimately by terminating Plaintiff Dickerson – just over two weeks before her

Novartis stock grants worth in excess of $750,000 were scheduled to vest. These adverse employment actions materially and adversely changed Plaintiff Dickerson's overall terms and conditions of employment.

112.    A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

113.    Defendants' retaliatory acts against Plaintiff Dickerson were a direct, proximate, and pretextual result of Plaintiff Dickerson's protected activities.

114.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Dickerson, entitling Plaintiff Dickerson to punitive damages.

115.    As a result of Defendants' unlawful conduct, Plaintiff Dickerson has suffered and continues to suffer harm, including, but not limited to, lost wages, lost bonuses, lost stock grants and/or stock options and other forms of compensation, lost benefits, attorneys' fees and cost, as well as impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.

116.    Plaintiff Dickerson is entitled to all legal and equitable remedies available for violations of Title VII, including, but not limited to, back pay, reinstatement and/or front pay, nominal damages, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and litigation costs.

## COUNT V
### (INDIVIDUAL CLAIM)

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),**
**42 U.S.C. § 2000e, *ET SEQ.***
**PAY DISCRIMINATION**
**(Plaintiff Orr Against Defendants)**

117.     Plaintiff Orr re-alleges and incorporates by reference each and every allegation in the previous paragraphs as though fully set forth herein.

118.     Defendants have discriminated against Plaintiff Orr by paying her less than similarly-situated male employees on the basis of her gender, including discrimination in setting her base salary, bonuses, stock grants and/or stock options, and other forms of compensation and benefits.

119.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Orr, entitling her to punitive damages.

120.     By reason of the continuous nature of Defendants' discriminatory conduct, which persisted throughout Plaintiff Orr's employment, Plaintiff Orr is entitled to the application of the continuing violation doctrine to all violations alleged herein.

121.     As a result of Defendants' discrimination, Plaintiff Orr has suffered and continues to suffer harm, including, but not limited to, lost wages, lost bonuses, lost stock grants and/or stock options and other forms of compensation, lost benefits, and attorneys' fees and costs.

122.     As a further result of Defendants' unlawful conduct, Plaintiff Orr has suffered and continues to suffer harm, including, but not limited to, impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.

123.     Plaintiff Orr is entitled to all legal and equitable remedies available for violations

of Title VII, including, but not limited to, back pay, nominal damages, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and litigation costs.

## PRAYER FOR RELIEF ON INDIVIDUAL AND COLLECTIVE ACTION CLAIMS

WHEREFORE, Plaintiff Dickerson on her own behalf and Plaintiff Orr on her own behalf and on behalf of the EPA Collective Action Class identified above, pray that this Court:

A.     Designate this action as a collective action on behalf of the proposed EPA Collective Action Plaintiff and

(i)     promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly-situated members of the EPA Collective Action Class, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and

(ii)     toll the statute of limitations on the claims of all members of the EPA Collective Action Class from the date the original complaint was filed until the EPA Collective Action Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt-in as Plaintiffs;

B.     Designate Plaintiff Orr as representative of the EPA Collective Action Class;

C.     Declare and adjudge that Defendants' employment decisions, policies, practices, and/or procedures challenged herein are unlawful;

D.     Issue a permanent injunction against Defendants and their partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any further unlawful decisions, policies, practices, procedures, customs, usages, gender discrimination, and retaliation as set forth herein;

30

E.     Award back pay to Plaintiffs and the EPA Collective Action Class, including a sum to compensate Plaintiffs and the EPA Collective Action Class for any increased tax liability on a lump-sum award of back pay;

F.     Award liquidated damages to Plaintiff Orr and the EPA Collective Action Class in the maximum amount available under the EPA;

G.     Award nominal, compensatory, and punitive damages to Plaintiffs;

H.     Order Defendants to restore Plaintiff Dickerson into the job that she would now be occupying but for Defendants' discriminatory decisions, policies, practices, and/or procedure or, in the alterative, award Plaintiff Dickerson front pay;

I.     Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Plaintiffs and the EPA Collective Action Class;

J.     Award Plaintiffs and the EPA Collective Action Class all pre-judgment interest and post-judgment interest available under law;

K.     Enter judgment in favor of Plaintiff Dickerson in excess of $10 million;

L.     Enter judgment in favor of Plaintiff Orr and the EPA Collective Action Class in excess of $100 million;

M.     Award Plaintiffs and the EPA Collective Action Class any other appropriate equitable relief; and

N.     Award additional and further relief as this Court may deem just and proper.

**VI.    <u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all issues triable of right by jury.

Dated: March 17, 2015

SANFORD HEISLER KIMPEL, LLP

By:

Jeremy Heisler (JH-0145)
Alexandra Harwin, D.C Bar No. 1003018
SANFORD HEISLER KIMPEL, LLP
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5656
Facsimile: (646) 402-5650
jheisler@sanfordheisler.com
aharwin@sanfordheisler.com

David Sanford, D.C. Bar No. 457933
SANFORD HEISLER KIMPEL, LLP
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009
Telephone: (202) 499-5201
Facsimile: (202) 499-5199
dsanford@sanfordheisler.com

Felicia Medina (Cal. Bar No. 255804)
SANFORD HEISLER KIMPEL, LLP
555 Montgomery Street, Suite 1206
San Francisco, CA 94111
Telephone: (415) 795-2024
Facsimile: (415) 795-2021
fmedina@sanfordheisler.com